IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

Terry Stephens,              )
                             )
                Plaintiff,   )
                             )        Civil Action NO. 9:12-1376-SB
v.                           )
                             )
Carolyn W. Colvin, Acting    )        **ORDER**
Commissioner of Social Security, )
                             )
                Defendant.   )
_____)

This is an action brought pursuant to section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("the Commissioner") final decision, which denied Plaintiff Terry Stephens' ("the Plaintiff") claim for supplemental security income ("SSI"). The record includes the report and recommendation ("R&R") of a United States Magistrate Judge, which was made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a) (D.S.C.). In the R&R, the Magistrate Judge recommends that the Court affirm the Commissioner's final decision denying benefits. The Plaintiff filed objections to the R&R, and the Defendant filed a response to those objections. See 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to an R&R within fourteen days after being served with a copy).



## BACKGROUND

### I.    Procedural History

The Plaintiff applied for SSI in May of 2008, alleging disability as of September 1, 2007, due to human immunodeficiency virus ("HIV") and hepatitis C. The Plaintiff was 40 years old when he filed his SSI application, and he has a limited education and past

relevant work experience as a warehouse worker. The Commissioner denied the Plaintiff's claims initially and upon reconsideration. The Plaintiff filed a request for a hearing, which was held on March 10, 2010, before an Administrative Law Judge ("ALJ"). On July 8, 2010, the ALJ issued a decision denying benefits. The Appeals Council thereafter denied the Plaintiff's request for review, making the ALJ's determination the final decision of the Commissioner. The Plaintiff filed this action on May 24, 2012, seeking judicial review of the Commissioner's final decision.

## II.    Evidence Presented

Neither party objects to the R&R's summary of the evidence presented. Therefore, the Court adopts this portion of the R&R and restates the evidence as follows..

### Spartanburg Regional Healthcare Cemter

The Plaintiff was seen at the Spartanburg Regional Healthcare Center ("SRHC") from January 2006 to October 2009. (R. at 190-263.) The Plaintiff's first visit to SRHC occurred in January 2006 after he was released from the South Carolina Department of Corrections, where he had served a ten-year sentence for armed robbery. At that visit, the Plaintiff was 38 years old and had been diagnosed with HIV since 1997. The Plaintiff complained at this visit that he experienced occasional night sweats. (R. at 197.) A month later, the Plaintiff was seen concerning blood pressure and was continued on Lisinopril. The month after that, the Plaintiff again complained of night sweats. (R. at 196.) On June 5, 2006, he was noted to be "[d]oing very well. Taking meds as prescribed [with no] difficulty or side effects, [except] tingling in [his] hands and feet." (R. at 194.)

On September 11, 2006, the Plaintiff denied having any problems with his medications but complained of some low back pain. (R. at 193.) Three months later,

2

which was almost a year from his first visit, the Plaintiff was seen for a yearly physical, at which the main complaint noted was back pain. (R. at 192.)

In March of 2007, the Plaintiff reported to SRHC that he was "doing excellent," while the nurse's assessment also noted that he "look[ed] well" and was "doing well." (R. at 191.) The Plaintiff was seen again three months later for a follow-up at which time he was still "feeling well" and really only complained about occasional night sweats. (R. at 190.)

In August of 2007, the Plaintiff was seen in the SRHC emergency room after a car accident. (R. at 198-203.) He had a contusion to his chest and left thigh. A nurse's follow-up assessment on September 21, 2007, indicates that the Plaintiff had spotty compliance with his medication regimen and that his chief complaint was night sweats. (R. at 258.)

The Plaintiff was seen on January 23, 2008, complaining of back and neck pain and a headache, and he was discharged with, among other things, instructions to do back exercises. (R. at 208-11.) Nurse assessments and clinic notes for January, February, April, and July of 2008 were generally unremarkable, and the Plaintiff's strength was noted as being full (5/5). Although the Plaintiff seeks disability as of September 2007, a notation from February 1, 2008, shows that a family member had advised SRHC medical staff that the Plaintiff had "gone to work," while another notation from April 8, 2008, indicates that the Plaintiff had been "laid off." (R. at 253-56.)



### Carolina Neurology

Dr. Kooistra at Carolina Neurology evaluated the Plaintiff on December 29, 2009, on referral from the Plaintiff's attorney. (R. at 346-54.) Dr. Kooistra performed nerve conduction studies on the Plaintiff's upper and lower extremities and opined that the Plaintiff had moderate bilateral carpal tunnel syndrome of the upper extremity and early

3

sensory polyneuropathy in the lower extremity. At a follow-up visit in February of 2010, it was noted that the Plaintiff had advised Dr. Kooistra that he had not worked since September of 2007, contrary to the February 1, 2008 SRHC notation. Dr. Kooistra's examination revealed no cyanosis, clubbing, or edema; that the Plaintiff's fine motor movements were normal and symmetric; that his reflexes were 2 + and symmetric; and motor examination revealed normal tone, bulk, and strength throughout. Gait testing revealed no additional weakness on heel to toe walks; the Plaintiff's tandem walk was normal; Romberg[1] was negative; and the Plaintiff's gait was antalgic. (R. at 360-61.)

Dr. Kooistra answered a questionnaire in March of 2010, opining that it would be "best" to limit the Plaintiff's fine and gross manipulation in the handling of objects to an occasional basis during an eight-hour workday. (R. at 363.) In a subsequent statement dated April 20, 2010, Dr. Kooistra opined that it would be difficult for the Plaintiff to perform work that required him to do more than occasional walking and standing because of a "diffuse sort of neuropathy in the legs," and that he should rest his hands a third of each workday so that his carpal tunnel syndrome, which was not severe enough to require surgery, did not worsen. (R. at 372.)

*Regional Infectious Disease*

The Plaintiff was seen for lab work at Regional Infectious Disease dating back to at least April fo 2008. Jennifer Schottleutner, a physician's assistant at Regional Infectious Disease, saw the Plaintiff in April of 2009 for an HIV follow-up visit, and she noted that the Plaintiff had HIV infection, neuropathy, hypertension, and hepatitis C. A physical

---

[1] A Romberg test is an indication of loss of the sense of position when a patient loses balance while standing erect, feet together, with eyes closed.

4

examination found no musculoskeletal deformity with a normal posture and gait, normal pulses in all four extremities, and a normal mood and affect. The Plaintiff was prescribed Neurontin for nerve pain. (R. at 316-20.)

Shottleutner saw the Plaintiff again in July of 2009 for another follow-up HIV visit. On this visit, the Plaintiff complained of a rash and a sore nose but it was noted that otherwise "he was doing very well and has no problems or complaints." (R. at 311.) The Plaintiff denied having any back pain, joint pain, joint swelling, muscle weakness or stiffness, or any depression or anxiety. (R. at 312.) It was noted that the Plaintiff was alert with normal mood and affect and normal attention span and concentration. (R. at 313.) A physical examination was unremarkable, and the Plaintiff was instructed to use Lotrimin cream, to apply an antibiotic ointment to his nose, to pick up his prescriptions, to have "nonfasting labs" performed, and to "follow up with the PA in three months." (R. at 314.)

In September of 2009, the Plaintiff was seen by Schottleutner, complaining of night sweats, itching and suspicious lesions, foot tingling and burning, depression, and anxiety. The Plaintiff denied having back, bone, or joint pain, or any myalgias. Schottleutner believed the Plaintiff suffered from dermatophytosis of the scalp and beard and prescribed him fluconazole. (R. at 301-03.)

Schottleutner saw the Plaintiff again in October of 2009 for complaints of a rash, itching, depression, and anxiety. She found the Plaintiff to have HIV infection; allergic dermatitis; and dermatophytosis of the scalp and beard. (R. at 292-95.) The Plaintiff was also seen the same day by Dr. Theodore Grieshop about his rash. (R. at 296-99.)

On October 21, 2009, Dr. Amanda Shugart advised the Plaintiff to "get off the couch" and exercise, noting that he had both a treadmill and a bowflex. (R. at 290.)

Schottleutner examined the Plaintiff again in November of 2009 with a rash on his face and bloody diarrhea. He also complained that his neuropathy was "really bad lately" and reported that he suffered from night sweats, wheezing, melena, heartburn, back pain, bone pain, joint pain, myalgias, a rash, itching, dryness, suspicious lesions, and foot tingling or burning that made it difficult to walk. A physical examination revealed the Plaintiff to be generally well-developed, well-nourished, in no acute distress, with a normal appearance. The physician's assistant assessed the Plaintiff with dermatophytosis of the scalp, neuropathy, and allergic dermatitis. (R. at 285-88.)

*Behavioral Health Center*

On March 9, 2010, James Ruffing, Ph.D., assessed the Plaintiff at the Behavioral Health Center on a referral from the Plaintiff's attorney. Dr. Ruffing opined that the Plaintiff had a grade equivalency of fourth grade but noted that the Plaintiff was educated to the eighth grade and was placed with the Department of Juvenile Justice on and off throughout his teenage years. Dr. Ruffing's impression was that the Plaintiff was borderline functionally literate; that he had an adjustment disorder with depressed mood, which was managed with medications; and that he had a history of antisocial personality behaviors and polysubstance abuse. (R. at 370.)

*Consultative Exams/Residual Functional Capacity*

Dr. Gordon Early performed a consultative exam on September 30, 2008, and found the Plaintiff to be "quite muscular" with full range of motion in both his upper and lower extremities. The Plaintiff was able to reach his toes and feet without difficulty, and he could do a full squat. The Plaintiff had a "rather dense" peripheral neuropathy over the hands and legs but had full (5/5) strength and grip. Dr. Early assessed the Plaintiff with HIV-

related fatigue and determined that he was at maximum medical improvement. Dr. Early also opined that although the Plaintiff had "[s]ignificant peripheral neuropathy probably from HIV," he did not think "this [was] impairing him presently." (R. at 234-35.)

### State Agency Physician

State agency physician Dr. Dale Van Slooten reviewed the Plaintiff's medical records and completed a physical residual functional capacity assessment on November 3, 2008. (R. At 264-71.) The Plaintiff's primary diagnosis was HIV and hepatitis C, with a secondary diagnosis of neuropathy and hypertension. Dr. Van Slooten found that the Plaintiff could perform medium work with the ability to sit and stand and/or walk, with normal breaks, for a total of six hours in an eight-hour workday, and that the Plaintiff's ability to push and/or pull, including the operation of hand and/or foot controls was unlimited. Dr. Van Slooten found that the Plaintiff had no other physical limitations other than that he could only occasionally climb ladders/ropes/scaffolds, that he was limited in his ability to feel (although he could engage in gross handling and fine fingering manipulation without limitation); and that he needed to avoid concentrated exposure to hazards such as machinery and heights.

## STANDARDS OF REVIEW

### I.    The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making the final determination remains with the Court. Mathews v. Weber, 423 US. 261, 269 (1976). The Court reviews de novo those portions of the R&R to which specific objection is made, and

7

the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

## II.    Judicial Review of a Final Decision

The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one.  Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  "Substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  In assessing whether substantial evidence exists, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## ANALYSIS

## I.    The Commissioner's Final Decision

The Commissioner is charged with determining  the existence of a disability.  The Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage

8

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  This determination involves a five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment.  20 C.F.R. § 404.1520(b).  If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations.  20 C.F.R. § 404.1520(d); 20 C.F.R. § Part 404, subpart P, App.1.  If so, the claimant is disabled.  If not, the next inquiry considers if the impairment prevents the claimant from returning to past work.  20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

Mastro, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step.  Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993).  The burden of production and proof remains with the claimant through the fourth step.  However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience.  Walls, 296 F.3d at 290.

Here, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since May 27, 2008, the application date.[2]  At the second step, the ALJ found that

---

[2]  The ALJ noted that the Plaintiff received unemployment insurance benefits in 2009, and that to obtain unemployment benefits, an applicant represents that he is able to perform work.  The ALJ also noted that a person can qualify for Social Security disability

the Plaintiff has the following severe impairments: HIV, bilateral carpal tunnel syndrome, and neuropathy. Third, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then determined that the Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), and specifically that the Plaintiff could: lift or carry 20 pounds occasionally and 10 pounds frequently; stand or walk, with normal breaks, for a total of six hours in an eight-hour workday; and sit, with normal breaks, for a total of six hours in an eight-hour workday. The ALJ also limited the Plaintiff to occasional bilateral handling and fingering; occasional use of ladders; frequent use of stairs; frequent balancing, kneeling, stooping, crouching, and crawling; and no concentrated exposure to dangerous machinery or unprotected heights. After determining that the Plaintiff was unable to perform any past relevant work, the ALJ determined that jobs exist in significant numbers in the national economy that the Plaintiff can perform, such as marker or cleaner. Therefore, the ALJ determined that the Plaintiff had not been under a disability since May 27, 2008, the date the application was filed.

## II. The Parties' Briefs

In the Plaintiff's brief, he argues that the Commissioner's final decision denying benefits contains legal errors. Specifically, the Plaintiff argues that the ALJ erred by: (1) failing to ask the VE to explain the conflict between his testimony and the Dictionary of

---

benefits even though he remains capable of performing some work, but the ALJ considered the Plaintiff's continuing receipt of unemployment benefits as a factor weighing against his credibility. (R. at 29.)

Occupational Titles ("DOT"), as required by Social Security Ruling ("SSR") 00-4p; (2) failing to give great or controlling weight to the opinion of the Plaintiff's treating physician, Dr. Kooistra; (3) failing to properly evaluate all of the medical evidence, including specifically the opinion of "other medical source" such as Physician's Assistant Schottleneuter; and (4) misstating the content of Dr. Early's opinion.

In response, the Defendant asserts that substantial evidence supports the Commissioner's final decision and that the Plaintiff's arguments are without merit.

### III.    The Magistrate Judge's R&R and the Plaintiff's Objections

In the R&R, the Magistrate Judge rejected each of the Plaintiff's arguments and recommended that the Court affirm the Commissioner's final decision.  The Plaintiff essentially objects to all of the Magistrate Judge's findings and reasserts the four arguments raised in his brief.  The Court addresses each of these arguments in turn.

#### *The Alleged Conflict Between the VE's Testimony and the DOT*

The Plaintiff first argues that the ALJ erred by failing to ask the VE to explain the conflict between his testimony and the DOT–the VE testified that the Plaintiff could perform the jobs of marker and cleaner, but both jobs require "frequent handling" pursuant to the DOT, and the ALJ determined that the Plaintiff could only perform "occasional bilateral handling."

In the R&R, the Magistrate Judge determined that no actual conflict existed between the VE's testimony and the DOT because the VE testified that the number of these jobs would be reduced by 40 percent to account for the Plaintiff's manipulative limitations.  The testimony reads as follows:

> Q.    All right.  I'd like you to consider someone of Mr. Stephens' age,

11

education and experience who is limited to light work.  And by that I mean he can sit, stand and walk, or walk up to six hours in an eight-hour day.  Can lift or carry 10 pounds frequently, 20 pounds occasionally.  Is further going to be limited to frequent bilateral handling and fingering, frequent being two-thirds of the time as opposed to continuous or repetitive.  Can only occasionally use ladders, can frequently use stairs, balance, kneel, stoop, crouch, and crawl.  Should not have any concentrated exposure to dangerous machinery or unprotected heights.  Obviously he can not do his past work, but would there be work available for such an individual?

A.     Yes, there would be, Your Honor.

Q.     Could you give me a couple of examples?

A.     One occupation would be the job of a marker, M-A-R-K-E-R, better known as a price marker, ticket marker.  This is a light, unskilled work activity.  Six to 8,000 in South Carolina.  175 to 200,000 on a national basis.  <u>DOT</u> code 209.587-034.  Another example would be the job of a cleaner in housekeeping.  This is a light, unskilled work activity.  <u>DOT</u> code 323.687-014.  Six to 8,000 in South Carolina.  150 to 175,000 on a national basis.

Q.     All right.  And if I change only one thing, and that is the handling and fingering, bilateral handling and fingering was only occasional rather than frequent, would these jobs still be available?

A.     They would still be available, but they would erode the number of jobs at least I'd say around 40 percent, Your Honor.

(R. at 55.)  In her decision, the ALJ stated: "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  (R. at 35.)

Social Security Ruling 00-4p emphasizes that before an ALJ can rely on a VE's testimony, the ALJ must identify and obtain a reasonable explanation for any apparent conflict between the VE's testimony and information in the DOT, and explain in the decision how any identified conflict has been resolved.  The ruling specifically provides:

Resolving Conflicts in Occupational Information

12

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. **When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.**

Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. **The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information**.

. . .

The Responsibility to Ask About Conflicts

When a VE or VS provides evidence about the requirements of a job or occupation, **the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE or VS evidence and information provided in the DOT.** In these situations, the adjudicator will:
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will provide a reasonable explanation for the apparent conflict.

Explaining the Resolution



When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is not disabled. **The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.**

SSR 00-4p (emphasis added). The ruling further provides that a reasonable explanation

for a conflict may be based on "other reliable publications" or the VE's own "experience in

job placement or career counseling." Id.

Here, the ALJ did not inquire on the record as to whether the VE's testimony was consistent with the DOT. In the R&R, the Magistrate Judge found that the ALJ had no duty to inquire, stating that such a duty exists only when there is "an apparent unresolved conflict."[3] As previously mentioned, the Magistrate Judge found that there was no "apparent unresolved conflict" because the VE reduced the number of available marker and cleaner jobs by 40 percent when the ALJ limited the hypothetical to "occasional" bilateral handling rather than "frequent."[4] The problem with the Magistrate Judge's analysis, at least in this Court's view, is that it ignores other portions of SSR 00-4p, which clearly create an affirmative duty on the part of the ALJ to inquire about the consistency of the VE's testimony and the DOT.[5] In addition, if the Court adopted the Magistrate Judge's analysis, the Court would be speculating about the resolution of *and the explanation for the resolution of* the conflict, because this information is not included in the

---

[3] One sentence of the ruling provides: "**[w]hen there is an apparent unresolved conflict** between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p (emphasis added).

[4] As previously set forth, the two jobs suggested by the VE–marker and cleaner–require "frequent" bilateral handling according to the DOT.

[5] For example, the ruling provides: "At the hearings level, as part of the adjudicator's duty to fully develop the record, **the adjudicator will inquire, on the record, as to whether or not there is such consistency.**" SSR 00-4p (emphasis added). Also, in a section titled "The Responsibility to Ask About Conflicts," the ruling provides: "[w]hen a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has **an affirmative responsibility to ask about any possible conflict between the VE or VS evidence and information provided in the DOT.**" Id. (emphasis added).

current record.[6] Because the ALJ failed to inquire about the conflict and fully develop the record, and because the ALJ's decision fails to include the necessary explanation for the resolution of the conflict, the ALJ's handling of the VE's testimony violated multiple provisions of SSR 00-4p. See Edmond v. Colvin, 2013 WL 4647805, *6 (D.S.C. Aug. 28, 2013) (finding that an ALJ violated several provisions of SSR 00-4p where the ALJ failed to inquire to the vocational expert whether there existed any conflict between his opinions and the DOT and to address the conflict between the DOT and the vocational expert's testimony). In light of these deficiencies, the Court simply cannot find that substantial evidence supports the ALJ's Step Five finding that jobs exist in significant numbers in the national economy that the Plaintiff can perform. The Court therefore declines to adopt this portion of the R&R and instead finds that remand is appropriate. On remand, the ALJ should consider whether further examination of the VE is necessary to fully develop her Step Five analysis.

*The Treating Physician Rule*

The Plaintiff asserts that the ALJ erred in failing to properly weigh the testimony of his treating physician, Dr. Kooistra, and more specifically, that the ALJ failed to properly

---

[6] When the VE reduced the number of jobs by 40 percent for an individual limited to occasional bilateral handling, he did so in apparent or perhaps implicit recognition of the conflict between the DOT's requirements and the hyphothetical individual's limitations. However, the ALJ never inquired about the conflict, and the record contains no explanation for the resolution of the conflict. Moreover, it is not clear whether the 40 percent reduction was based on "other reliable publications" or the VE's own "experience in job placement or career counseling." SSR 00-4p. Finally, in her decision the ALJ simply stated–without offering any explanation for it and despite the fact that she never asked the VE whether his testimony was consistent with the DOT–that "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. at 35.) This violates the provisions of SSR 00-4p.

credit an attorney-prepared statement signed by Dr. Kooistra indicating that the Plaintiff's neuropathy would cause him to have difficulty performing work that required more than occasional standing and walking.

In her decision, the ALJ stated that she "gave some weight to the opinion of treating physician Dr. Kooistra," but that she did not give the opinion controlling weight because it was "not consistent with the weight of the other substantial evidence in the record." (R. at 33.)  She then referred to a prior treatment record where Dr. Kooistra noted that the claimant had no weakness in his gait test and normal heel to toe walks as well as notes from Spartanburg Regional indicating that the Plaintiff ambulates well. She referenced the Plaintiff's testimony that he could walk to his sister's house, and ultimately, she found that the record as a whole demonstrated that the Plaintiff had some limitations with prolonged standing and walking but not to the extent indicated in Dr. Kooistra's prepared statement.

Under the regulations of the Social Security Administration, the Commissioner must consider all medical evidence and the opinions of medical sources, including treating physicians.  Id. § 404.1545.  The Commissioner "[g]enerally . . . give[s] more weight to opinions from . . . treating sources" based on the view that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." Id. § 404.1527(c)(2).  Further, the Commissioner "[g]enerally . . . give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]."  Id. § 404.1527(c)(1).

16

Under some circumstances, the opinions of treating physicians are to be accorded controlling weight. Even where the opinions of the claimant's treating physicians are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of specifically identified factors, including the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician is a specialist. Id. §§ 404.1527(e)(1)-(5). The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96–2p, 61 Fed, Reg. 34490, 34492 (July 2, 1996). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence ." Mastro v. Apfel, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the Court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2013).

Here, the ALJ specifically considered and discussed Dr. Kooistra's opinion about his ability to stand and walk, giving it some but not controlling weight based on the other evidence in the record, and the ALJ specifically cited to other evidence conflicting with Dr. Kooistra's opinion that the Plaintiff should be limited to only occasional standing and walking. It is not this Court's job to re-weigh the evidence; after review, the Court agrees with the Magistrate Judge's findings on this issue and finds no reversible error in the ALJ's treatment of Dr. Kooistra's opinions in light of the record as a whole. Accordingly, the

Court adopts this portion of the R&R and overrules the Plaintiff's objection.

*Evidence from "Other Medical Sources"*

The Plaintiff contends that the ALJ failed to evaluate all of the medical evidence, including the opinion of Physician's Assistant Jennifer Schottleutner. Schottleutner completed a Report on Adult with HIV Infection on February 22, 2010, in which she found that the Plaintiff reported manifestations of HIV infection and had marked difficulties in maintaining social functioning or marked difficulties in concentration, persistence, or pace. The ALJ noted Schottleutner's report but discounted her opinion for two reasons: (1) because she "is a physician's assistant and therefore not a medically acceptable source according to [SSR] 96-2p" and (2) because her assertions were not "consistent with the other medical evidence of record." (R. at 32.)

In the R&R, the Magistrate Judge found no reversible error in the ALJ's consideration of Schottleutner's report. Even so, the Magistrate Judge did note that the "ALJ could have arguably gone into a more detailed discussion of this opinion." (Entry 17 at 17.)

Although the ALJ was correct in stating that a physician's assistant is not an "acceptable medical source,"[7] the Social Security regulations make it clear that "in addition

---

[7] Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p. A physician's assistant qualifies as an "other source" as defined in 20 C.F.R. § 404.1513(d) and 416.913(d). Social security ruling 06-03p notes:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled

to evidence from the acceptable medical sources listed . . . we may also use evidence from other sources to show the severity of your impairments and how it affects your ability to work." 20 C.F.R. § 416.913. An ALJ's discussion of an "other source" opinion, such as Schottleutner's, must be specific enough to "allow[ ] a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p.

Here, the Court recognizes—as the Magistrate Judge pointed out—that the ALJ was under no obligation to credit Schottleutner's opinion over the opinions of the Plaintiff's treating and consulting physicians. However, when the ALJ summarily dismissed Schottleutner's opinion by stating that it was inconsistent with the other medical evidence, but without pointing to the other inconsistent medical evidence, she made it difficult for this Court to follow her reasoning. Thus, although the Court agrees with the Magistrate Judge that this, standing alone, would not constitute reversible error, as this case is already subject to remand, the Court urges the Commissioner on remand to provide a more thorough explanation of her consideration of this "other source" opinion.

### *Dr. Early's Opinion*

The Plaintiff contends that the ALJ misstated Dr. Early's opinion and argues that Dr. Early expressed an opinion that supports the Plaintiff's complaints of severe fatigue. Specifically, in his assessment notes, Dr. Early wrote:

---

primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rues, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p.

> HIV-related fatigue. I do not think that he is going to get much better this is
> at MMI. I suggest that he go ahead and continue treating with the present
> regimen and see if it contributes to fatigue. This is at MMI. Significant
> peripheral neuropathy probably from HIV. I do not think this is impairing him.

(R. at 235.) In her decision, the ALJ remarked: "The only medical source of record who noted the claimant's reports of fatigue was consultative examiner Dr. Early. Dr. Early concluded his examination by stating that the claimant's symptoms were not currently impairing him." (R. at 33.)

Here, the Court is inclined to agree with the Plaintiff that the ALJ slightly misstated Dr. Early's opinion. When Dr. Early stated "I do not think **this** is impairing him" at the end of his assessment, it appears that he was referring to the peripheral neuropathy referenced in the previous sentence and not the Plaintiff's fatigue, which Dr. Early determined was at maximum medical improvement. In other words, contrary to the Magistrate Judge's assertion, Dr. Early did not state that "the claimant's symptoms were not currently impairing him." In addition, in discounting the Plaintiff's complaints of fatigue, the Court is concerned that the ALJ may have relied on medical reports pre-dating the Plaintiff's alleged onset date. Ultimately, the issue of fatigue is critical, as the VE testified that no jobs would be available for an individual who missed at least one day of work per week, or four or more days a month, due to fatigue and other HIV complications. (R. at 56.) Therefore, on remand, the Commissioner should reconsider the medical evidence concerning the Plaintiff's complaints of fatigue, including the opinion of Dr. Early and any other relevant medical evidence.

## **CONCLUSION**

For the reasons set forth herein, the Court declines to adopt the R&R (Entry 17) in

full.  First, although the Court agrees with the Magistrate Judge and finds no reversible error in the ALJ's treatment of Dr. Kooistra's opinion about the Plaintiff's standing and walking limitations, the Court disagrees with the Magistrate Judge and finds that the ALJ erred at Step Five of her analysis when she relied on the VE's testimony without inquiring about the conflict between the VE's testimony and the DOT and without resolving the conflict and explaining its resolution in her decision.  On remand, the ALJ shall consider whether further examination of the VE is necessary to fully develop her Step Five analysis. In addition, although the Court does not find it to be reversible error, the Court urges the Commissioner on remand to provide a more thorough explanation of her consideration of Physician's Assistant Schottleutner's "other source" opinion.  Finally, because the Court believes the ALJ misstated Dr. Early's opinion regarding the Plaintiff's complaints of fatigue, the Commissioner shall reevaluate this issue upon remand.  Therefore, it is hereby

ORDERED that the Commissioner's denial of benefits is reversed under sentence four of 42 U.S.C. § 405(g) and 1383(c)(3), and the matter is remanded to the Commissioner for further consideration consistent with this order.

IT IS SO ORDERED.

Sol Blatt, Jr.
Senior United States District Judge

September 26, 2013
Charleston, South Carolina

21